Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com
Yaman Salahi (SBN 288752)
ysalahi@edelson.com
P. Solange Hilfinger-Pardo (SBN 320055)
shilfingerpardo@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| MICHAEL ELLIOTT JESSUP, individually and on behalf of all others similarly situated, *Plaintiff,* v. SAMUEL BANKMAN-FRIED, an individual, CAROLINE ELLISON, an individual, NISHAD SINGH, an individual, GARY WANG, an individual, and SAM TRABUCCO, an individual, *Defendants.* | Case No. **CLASS ACTION COMPLAINT FOR:** **(1) FRAUD;** **(2) UNJUST ENRICHMENT; and** **(3) CONVERSION.** **DEMAND FOR JURY TRIAL** |

Plaintiff Michael Elliott Jessup, individually and on behalf of a proposed class, brings this Class Action Complaint against Defendants Samuel Bankman-Fried, Caroline Ellison, Nishad Singh, Gary Wang, and Sam Trabucco. Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and as to all other matters, upon information and belief.

## NATURE OF THE ACTION

1.      In just over a decade, the crypto market has become a trillion-dollar industry. These new forms of digital assets and currencies are unlike any form of traditional financial instruments. They are not issued by any governments, not regulated by any central authorities,

1    and essentially any person with specialized hardware and computer software could create them.

2    Young people throughout the world raced to buy crypto in hopes that this new form of "Internet

3    money" could make them rich and, for many, it did. But crypto remained a mystery for most,

4    especially bigger financial institutions and governments. Crypto needed a proper spokesperson

5    who could convince society that cryptocurrencies were smart, stable, and safe investments.

6    That's where Defendant Samuel Bankman-Fried (or "SBF") came in, a then twenty-something

7    year-old self-promoted eccentric genius.

8            2.      In 2019, Defendant SBF launched a cryptocurrency exchange called FTX, where

9    users could buy and sell crypto and exchange them for traditional currencies, like United States

10   Dollars. SBF successfully convinced millions of users, hedge funds, regulators, and other major

11   institutions that he was the new era of crypto and that they should believe in him and invest in

12   his platform. And it worked. At its peak, FTX became one of the largest crypto exchanges in the

13   world valued at over $32 billion, with its logo adorning everything from Formula 1 race cars to a

14   Miami basketball arena.

15           3.      Not even thirty-years-old at this point, SBF had become the leader of one of the

16   biggest crypto markets in the world, a celebrated philanthropist worth an estimated $26 billion,

17   and a major political donor who quickly became a power player in Washington.

18           4.      But all of this was a mirage that came crashing down on November 11, 2022,

19   when FTX abruptly filed for bankruptcy.

20           5.      Overnight, billions of dollars belonging to Plaintiff and the Class evaporated.

21   Users could no longer withdraw their crypto or money. While SBF had been publicly trying to

22   convince users everything was fine, in reality, it was not.

23           6.      The days following FTX's collapse revealed that it was not the traditional crypto

24   market volatility or instability that tanked FTX, but rather one of the most spectacular financial

25   frauds since Bernie Madoff, deliberately carried out by SBF and his inner circle at FTX and

26   Alameda Research (or "Alameda"): Defendants Caroline Ellison, Nishad Singh, Gary Wang, and

27   Sam Trabucco (together, the "Inner Circle").

28           7.      As explained in more detail below, SBF tricked people into thinking FTX was

1  worth far more than it was and essentially used FTX—and his customers' deposits, in

2  particular—as his personal slush fund. First, SBF effectively paid investors, employees, and

3  vendors shares of the company in his own crypto currency, FTT, which he controlled and

4  inflated the value of, and loaned out FTX customer deposits to his (supposedly separate) crypto

5  hedge fund, Alameda Research. SBF had even written a secret back door into FTX's code that

6  allowed him to siphon off customer deposits and move them to Alameda, where he could cover

7  Alameda's major trading losses. He also regularly used FTX's assets to fund his own personal

8  investments (like his half billion-dollar investment into Robinhood), purchase $300 million

9  worth of real estate, and become the second most prolific funder of political candidates after

10  George Soros.

11      8.      In the end, SBF was not the altruistic savior to the crypto industry that he held

12  himself out to be. He instead chose to capitalize on the lack of effective regulatory oversight of

13  the crypto market and defraud his customers out of billions of dollars.

14      9.      Plaintiff Jessup is just one consumer who had crypto invested in FTX and who

15  has lost money as a result of Defendants' conduct. Accordingly, Jessup brings suit on behalf of

16  himself and all others similarly situated, to seek both monetary and equitable relief for

17  Defendants' deceptive and unlawful conduct.

18                                    **PARTIES**

19      10.     Plaintiff Michael Elliott Jessup is a natural person and a citizen of the State of

20  California. He resides in Marin, California.

21      11.     Defendant Samuel Bankman-Fried is a natural person and citizen of the United

22  States. Bankman-Fried was co-founder and CEO of FTX, which had offices in Berkeley,

23  California.

24      12.     Defendant Caroline Ellison is a natural person and citizen of the United States.

25  Ellison was co-CEO of Alameda Research, which had offices in Berkeley, California.

26      13.     Defendant Gary Wang is a natural person and citizen of the United States. Wang

27  was co-founder and Chief Technology Officer of FTX, which had offices in Berkeley,

28  California. Wang also co-founded Alameda Research with SBF.

14.     Defendant Nishad Singh is a natural person and citizen of the United States. Singh was Director of Engineering at FTX, which had offices in Berkeley, California. Before that, he was Director of Engineering at Alameda Research.

15.     Defendant Sam Trabucco is a natural person and citizen of the United States. Trabucco was co-CEO of Alameda Research, which had offices in Berkeley, California.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

17.     This Court has personal jurisdiction over Defendants because they conduct business in this District and the unlawful conduct alleged in the Complaint occurred in, was directed to, and/or emanated from this District, including disseminated misrepresentations about FTX and its relationship with Alameda Research throughout the District.

18.     Defendants purposefully availed themselves of the benefits of the laws of California in conducting business and transactions in the state. Defendants advertised heavily in California, including on television and with local sponsorships. FTX paid for the naming rights of the University of Berkeley football stadium to have it named FTX Field at California Memorial Stadium and have its logo emblazoned on the field. FTX also partnered with the Golden State Warriors (based out of San Francisco, California) and had its logo appear at games held by the Santa Cruz Warriors. FTX aired an advertisement during the 2022 Superbowl, which was held in California.

19.     Defendants instructed customers to deposit funds via wire transfer to Silvergate Bank, a California business entity with its principal place of business in La Jolla, California. Upon information and belief, FTX received hundreds of millions of dollars in deposits customers made through Silvergate. Defendants even instructed some FTX customers to send wire transfers directly to Alameda's accounts at Silvergate.

20.     Defendants also sought out investments for FTX and Alameda Research in this

1   state, including from some investment firms in the District, such as Sequoia Capital, which is

2   headquartered in Menlo Park, California.

3        21.    Plaintiff was induced to engage in his transactions with FTX in the District.

4        22.    Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial

5   part of the events or omissions giving rise to the unlawful conduct alleged in the Complaint

6   occurred in, was directed to, and/or emanated from this District.

7   <center>**DIVISIONAL ASSIGNMENT**</center>

8        23.    Pursuant to Civil Local Rule 3-2(d), this case should be assigned to the San

9   Francisco Division.

10  <center>**GENERAL ALLEGATIONS**</center>

11  **I.    FTX's Backstory.**

12       24.    Defendants SBF and Wang co-founded FTX in 2019 as a cryptocurrency

13  exchange. SBF developed the FTX exchange to support all major cryptocurrencies, leveraged

14  tokens, and facilitate over-the-counter trading. FTX's stated mission, spearheaded by SBF, was

15  to build a crypto exchange with greater consumer protections and better user experiences.

16  FTX.com offered traders outside the US crypto tokens meant to mirror the performance of

17  specific stocks. By 2019, FTX was handling about $1 billion daily trades. FTX US, which allows

18  access to US users, also launched equity trading in 2022.

19       25.    The company invested millions in ad campaigns and sport and celebrity

20  partnerships to imbue it with a vail of legitimacy. FTX ran a $30 million Superbowl ad in in

21  2021 featuring comedian Larry David. It purchased naming rights to the Miami Heat arena,

22  along with the naming rights to the University of California Berkeley's football field for $17.5

23  million in 2021. In April 2022, SBF sat on a stage with Bill Clinton and Tony Blair at an FTX-

24  sponsored crypto conference in the Bahamas.

25       26.    SBF held himself out as a liaison between the crypto world and Congress, and

26  even the White House. On December 8, 2021, SBF testified in front of the House Financial

27  Services Committee, touting FTX as a consumer-friendly, safe investment platform. "FTX has

28  designed and offered a platform with a market structure that is risk reducing," he told members

of Congress, while claiming FTX embraced regulatory oversight.[1] In an October 2021 press release, SBF bragged of being able to "partner with investors that prioritize positioning FTX as the world's most transparent and compliant cryptocurrency exchange."[2]

27.     This investment in image-setting paid off as many consumers were taken in by the ruse. Consumers believed FTX was safer than alternative cryptocurrency exchanges and that there were regulations in place to protect their investments. In 2021, FTX was handling around 10% of the $3.4 trillion face value of derivatives traded by crypto investors each month.

28.     Consumers were not alone in thinking FTX was on the up and up. FTX was one of the fastest growing crypto exchanges in the world. FTX grew from $25 billion in value in October 2021, to a $32 billion valuation by January 2022. FTX's smaller, United States component, FTX US, reached an $8 billion valuation in January 2022, raising $400 million in its first external fundraising round.

29.     But less than eleven months later, FTX would come crashing down. To help understand SBF and the Inner Circle's scheme, a brief introduction to SBF's supposedly separate hedge fund, Alameda Research follows.

## II.     Alameda Research.

30.     Before FTX, SBF founded the cryptocurrency hedge fund Alameda Research in his apartment in 2017. Gary Wang, a member of the Inner Circle who became CTO of FTX, co-founded the startup with SBF. The two have long had ties, beginning with meeting at a math camp in high school, and going on to be college roommates. When Alameda was first started, they ran the company out of a three-bedroom apartment in Berkeley—the downstairs their dedicated office space. When SBF left Alameda to start FTX, he brought Gary Wang and another member of the Inner Circle, Nishad Singh, with him.

31.     In 2021, SBF handed over the reins of Alameda to two relatively inexperienced

---

[1] *Digital Assets and the Future of Finance: Understanding the Challenges and Benefits of Financial Innovation in the United States Before the H. Comm. on Fin. Servs.*, 117th Cong. (2021) (Testimony of Sam Bankman-Fried Co-Founder and CEO of FTX), https://financialservices.house.gov/uploadedfiles/hhrg-117-ba00-wstate-bankman-frieds-20211208.pdf.

[2] Harriet Agnew et al., *FTX lures blue-chip investors in funding round, valuing crypto group at $25bn*, FINANCIAL TIMES (Oct. 21, 2021), https://www.ft.com/content/56b35970-de1e-41a6-9fb1-b482075e092b.

traders, Defendants Caroline Ellison and Sam Trabucco. Between the two of them, they only had a few years of experience trading in conventional markets.

32.     Trabucco had a penchant for gambling and bragged about how he applied his gambler's instincts to Alameda's crypto trading. Trabucco bragged that he had been banned from multiple casinos for counting cards in blackjack. In a January 2021 Twitter thread, Trabucco claimed, "Bigger is Bigger (when Betting is Better)" in both betting and trading. Trabucco encouraged aggressive trading and embracing risk as co-CEO of Alameda. This risk-loving strategy ultimately led Alameda to make many bad investments that led to its downfall. In August 2022, Trabucco abruptly left Alameda, stepping down as co-CEO just before the house of cards collapsed.

33.     SBF claimed there were adequate firewalls between Alameda and FTX. In an August 2022 interview with Bloomberg, SBF stated, "Alameda is a wholly separate entity," and claimed, "They're different offices, like different principal offices. We don't have any shared personnel. We're also not the same company."[3] Ellison made similar misrepresentations in September 2022, stating, "[w]e're arm's length and don't get any different treatment from other market makers."[4] But these, too, were lies.

34.     For a period, Wang, Singh, Ellison, and SBF all lived in the same house in the Bahamas. The FTX and Alameda offices in the Bahamas were very nearby. The Inner Circle was socially and romantically entangled, with Ellison and SBF having dated in the past. Wang, Singh, and Ellison were also all on the board of SBF's FTX Foundation. There was nothing arm's length about the relationship between the executives at FTX and Alameda.

35.     FTX and Alameda had a history of propping each other up. Even before FTX became embroiled in Alameda's bad bets in 2022, Alameda had loaned FTX money to shelter it from a $1 billion loss after a customer trade on the exchange blew up. Early in 2021, Alameda

---

[3] Annie Massa et al., *What FTX's Bankman-Fried Said When We Asked Him About Red Flags*, BLOOMBERG NEWS (Nov. 17, 2022), https://www.bloomberg.com/news/articles/2022-11-18/what-ftx-s-sam-bankman-fried-said-when-we-asked-him-about-red-flags-at-alameda.

[4] Annie Massa et al., *Crypto Quant Shop With Ties to FTX Powers Bankman-Fried's Empire*, BLOOMBERG NEWS (Sept. 14, 2022), https://www.bloomberg.com/news/articles/2022-09-14/trading-firm-alameda-research-powers-ftx-ceo-sam-bankman-fried-s-crypto-empire?utm_source=twitter&utm.

took on much of FTX's exposure when a client's leveraged bet on an obscure token broke through the guardrails designed to shield the exchange from sustaining losses when trades went south. This was yet another example of how SBF and the Inner Circle used Alameda and FTX to prop each other up, even while publicly maintaining that the exchange and the hedge fund acted separately.

36.     Alameda made more than 150 investments across the crypto industry, including in the now-bankrupt crypto broker Voyager Digital. FTX executives also took out billions of dollars in loans from Alameda to fund all manner of activities, from SBF's political contributions to his purchase of a 7.6% stake in Robinhood for $650 million.

**III.     SBF and the Inner Circle's Fraud.**

37.     SBF made sure to get paid at both Alameda and FTX, while outwardly claiming to live a frugal lifestyle. SBF once claimed he lived off $100,000 a year, when in reality, he was taking in much more. In October 2021, FTX raised over $420 million from several well-known investors. But instead of making its way to the exchange, $300 million went to SBF himself when he sold his stake in FTX. This cash out dwarfs the normal amounts startup founders award themselves. SBF attempted to justify this payoff by claiming it was a partial reimbursement for money he spent to buy out Binance's stake in FTX. Instead, this was yet another example of how SBF took money that was meant for the exchange and its customers and used it for himself.

38.     At age 30, SBF was briefly worth $26 billion. Alameda Research was reported to have made $1 billion in profit in 2020, and the newly founded FTX was making $350 million in profit off trading fees. These profits played into SBF's "effective altruism" endgame, in which he believed himself better situated to solve the world's problems as a billionaire capable of giving away vast sums of his wealth. SBF promised to give away almost all his money, yet as of March 2021, he had only given away about 0.1% of his fortune. He claimed he would ramp up his giving once he became more liquid.

39.     The relationship between FTX and Alameda had always been murky, as described above. In the traditional finance world, there are clear regulations and laws limiting the use of depository funds for trading. In 1933, Congress passed the Glass-Steagall Act which required

that commercial banks refrain from investment banking activities. This was to protect depositors from potential losses caused by bank speculation in stocks. But in the crypto world, no such regulations exist to protect customer deposits.

40.     While it appeared from the outside that SBF was funding his spending and lending in part from profits he made at Alameda, in reality, the hedge fund was surviving only because SBF was loaning Alameda billions of dollars of FTX customer deposits. SBF claimed publicly that Alameda (the hedge fund) and FTX (the exchange) were kept separate. But this was hardly the case. SBF owned more than half of FTX and almost all of Alameda. The two companies shared office space in Berkeley, California, and both were housed in the Bahamas on the same corporate campus. In the Bahamas, Bankman-Fried lived in the same apartment as Alameda CEO Caroline Ellison, along with other roommates.

41.     In the spring of 2022, the crypto market was shaken by its own Great Recession-like financial crisis. The popular stablecoin (meaning it was supposed to always be worth about $1) TerraUSD crashed to 2¢. A large crypto hedge fund, Three Arrows Capital, collapsed. Crypto asset prices began to crash, and several crypto companies failed in rapid succession. SBF stepped in and began scooping up distressed crypto companies as a lender of last resort. FTX US bailed out BlockFi Inc., a digital-asset lender, with a $400 million credit after BlockFi took an $80 million hit from bad Three Arrows debt. Alameda extended a $500 million emergency credit line to the crypto brokerage Voyager Digital Ltd. Despite the injection of capital, Voyager went under.

42.     Ultimately, none of these investments panned out. Alameda had borrowed money to make investments, then got FTX to bail it out to help make payments on those loans. SBF used customer deposits to fund Alameda's bailout without the permission of those customers. Alameda's loan to Voyager was wiped out once the brokerage firm filed for bankruptcy. To help prop up Alameda and its failed investments, SBF transferred at least $4 billion from FTX to Alameda in 2022. The money SBF transferred from FTX was, in large part, FTX customer deposits.

43.     SBF transferred these funds without using normal methods that would be

traceable by employees outside the Inner Circle. The company's books had a "back door" built-in using bespoke software. This backdoor allowed SBF to alter the company's financial records without alerting other people in the company. Upon information and belief, Defendants Wang, Singh, and Ellison knew about SBF's decision to send customer funds to Alameda.

44.    Defendants Wang and Singh controlled the code for the exchange's matching engine and funds. SBF also had control of the code, but with subpar skills, he relied on Wang and Singh for their technical know-how. With their control of the code governing funds, they were able to move funds around without others noticing.

45.    Along with the substantial funds (largely comprised of customer deposits) that were transferred from FTX to Alameda, substantial amounts of money were spent on things not related to the business, as well. This includes approximately $300 million worth of Bahamas real estate consisting of homes and vacation properties for FTX senior executives. In 2022, SBF spent more than $40 million on political campaigns, and donated $5 million to the investigative news outlet ProPublica. At no point did consumers consent or were even made aware that their deposits were being misused in this way.

46.    What looked from the outside like a wunderkind using a competitive advantage to make billions, was actually a group of inexperienced people mismanaging a multibillion-dollar company. When SBF's ventures failed, he took consumers' deposits and tried to gamble them to recoup his losses.

**IV.    SBF and the Inner Circle's Misrepresentations.**

47.    Throughout their time as executives of FTX and Alameda Research, SBF and the Inner Circle made regular and calculated misrepresentations about how FTX customer funds were used, including:

      a.    Even as the FTX rouse was coming undone, SBF publicly lied about how customer assets were used to try to prevent people from withdrawing their deposits. On November 7, 2022, SBF tweeted that "FTX has enough to cover all client

1    holdings. We don't invest client assets (even in treasuries)."[5] He said this while

2    knowing FTX had sent billions of dollars in customer deposits to Alameda to be

3    invested.

4    b.  In July 2022, an FTX US employee tweeted that "direct deposits from employers

5        to FTX US are stored in individually FDIC-insured bank accounts in the users'

6        names" and that "stocks are held in FDIC-insured and SIPC-insured brokerage

7        accounts."[6] The FDIC subsequently sent FTX a warning letter to stop

8        misrepresenting that FTX accounts were FDIC ensured.

9    c.  SBF publicly claimed Alameda and FTX were wholly separate entities, even after

10       using a back door to send billions of FTX customer funds to Alameda. Ellison

11       similarly misrepresented that Alameda and FTX were kept at arm's length and that

12       Alameda received the same treatment from FTX as any other exchange, even after

13       having illicitly received billions of FTX customer funds.

14   d.  In December 2021, and again in May 2022, SBF testified in front of Congress,

15       taking the position that FTX was in favor of regulatory oversight. On October 19,

16       2022, SBF tweeted that "we need regulatory oversight and customer protection"

17       and "we should establish regulation."[7] But after he stepped down as CEO, SBF

18       admitted that claiming to want regulation was "just PR." "[F]--- regulators[.]

19       [T]hey make everything worse."[8] This, too, was a lie SBF and his Inner Circle

20       perpetuated in order to make consumers feel safe depositing their money in FTX.

21   48.    All these misrepresentations had the goal of tricking consumers into believing

22

23   [5] Britney Nguyen, *Sam Bankman-Fried deleted his tweet saying FTX "assets are fine" on the day he announced his
24   Binance deal*, BUSINESS INSIDER (Nov. 9, 2022), https://www.businessinsider.com/ftx-sam-bankman-fried-deleted-
     assets-fine-tweet-binance-deal-2022-11.

25   [6] Letter from Fed. Deposit Ins. Corp. to Brett Harrison, Individually and as President of FTX US and Dan Friedberg,
26   Chief Regulatory Officer of FTX US (Aug. 18, 2022), https://www.fdic.gov/news/press-releases/2022/ftx-harrison-
     letter.pdf.

27   [7] Samuel Bankman-Fried (@SBF_FTX), TWITTER (Oct. 19, 2022),
     https://twitter.com/SBF_FTX/status/1582835490515927041.

28   [8] Kelsey Piper, *Sam Bankman-Fried tries to explain himself*, VOX (Nov. 16, 2022), https://www.vox.com/future-
     perfect/23462333/sam-bankman-fried-ftx-cryptocurrency-effective-altruism-crypto-bahamas-philanthropy.

depositing money on FTX was a "safe and easy way to get into crypto," rather than a scheme implemented by SBF and the Inner Circle to funnel money to Alameda.

## V.    The Fall of FTX.

49.    On November 2, 2022, CoinDesk ran a story about a leaked balance sheet from Alameda, which purportedly operated separately from FTX. The leaked document demonstrated a significant portion of Alameda's assets were in SBF's crypto token, FTT (issued by FTX). Alameda, despite its supposed sophistication, was invested heavily in a token minted from thin air by SBF.

50.    On November 6, 2022, CEO of rival exchange Binance, Chanpeng Zhao tweeted that "[d]ue to recent revelations" it would be selling off its FTT.[9] A run on the bank followed as consumers desperately attempted to withdraw their assets from FTX. Were FTX simply holding consumers' assets and functioning as a middleman in trades, it would have had no problem fulfilling customers' requests to withdraw. But the assets were gone. FTX had to halt customer withdrawals after about $5 billion worth of withdrawal requests flooded in.

51.    On November 7, 2022, SBF tweeted that "FTX is fine. Assets are fine." He also stated, "FTX has enough to cover all client holdings. We don't invest client assets (even in treasuries)."[10] These were lies.

52.    On November 8, 2022, SBF announced that Binance would be taking over FTX to ensure consumers could regain access to their assets. But one day later, on November 9, 2022, Binance pulled out of the deal. A Binance spokesperson told CoinDesk that "[a]s a result of corporate due diligence, as well as the latest news reports regarding mishandled customer funds and alleged U.S. agency investigations, we have decided that we will not pursue the potential acquisition of FTX.com."[11]

53.    On November 11, 2022, FTX, FTX US, and Alameda all filed for bankruptcy as

---

[9] Chanpeng Zhao (@cz_binance), TWITTER (Nov. 6, 2022 at 7:47 AM), https://twitter.com/cz_binance/status/1589283421704290306?lang=en.

[10] Nguyen, *supra* note 5.

[11] Kevin Reynolds, *Binance Walks Away From Deal to Acquire FTX*, COINDESK (Nov. 9, 2022), https://www.coindesk.com/business/2022/11/09/binance-walks-away-from-ftx-deal-wsj/.

SBF resigned. A day after FTX filed for bankruptcy, an unauthorized withdrawal of crypto worth more than $400 million occurred as a result of a hack, leading to more losses. Even weeks after entering Chapter 11, it is unclear exactly where all FTX's missing assets are. At least $1 billion in FTX customers' funds disappeared from the collapsed exchange. John Ray, who has taken over FTX in an attempt to right the dangerously listing ship, filed a scathing statement that assessed SBF and his leadership of FTX, namely stating that the exchange was controlled by "a very small group of inexperienced, unsophisticated and potentially compromised individuals."[12] What is clear is that SBF took $10 billion in customer funds from FTX and transferred much of it to its sister trading company, Alameda Research, without customer permission, and now a large portion of that total is missing.

## FACTS SPECIFIC TO PLAINTIFF MICHAEL ELLIOTT JESSUP

54.     Plaintiff Michael Elliott Jessup joined FTX in 2022. Having seen SBF's public statements (Jessup followed SBF on Twitter), he believed FTX was a safe platform and that SBF was a trustworthy person at the helm of the exchange. This was particularly appealing as SBF's stated mission was to help move the crypto space to become more institutionalized.

55.     Trusting that FTX would do the simple task of holding on to his digital assets, Jessup placed nearly two Bitcoins (valued at approximately $32,000 on November 10, 2022) and about forty Solana (valued at approximately $1000 on November 10, 2022) in an FTX US account.

56.     But that soon changed. As news reports began to reveal trouble with FTX, Jessup grew concerned.

57.     Amidst the chaos, Jessup logged on to his FTX US account and attempted to withdraw his assets. But FTX would not allow him to do so. Indeed, a leaked FTX balance sheet indicated that FTX owned exactly zero (0) Bitcoins by the time it filed for bankruptcy.

58.     Had Plaintiff Jessup known of SBF's fraud, he would never have deposited his Bitcoin on the FTX exchange.

---

[12] Eliot Brown et al., *FTX's Sam Bankman-Fried Cashed Out $300 Million During Funding Spree,* WALL ST. J. (Nov. 18, 2022), https://www.wsj.com/articles/ftxs-sam-bankman-fried-cashed-out-300-million-during-funding-spree-11668799774.

1

**CLASS ALLEGATIONS**

2    59.    **Class Definition**: Plaintiff brings this action pursuant to Federal Rule of Civil

3    Procedure 23(b)(2) and 23(b)(3) on behalf of himself and a Class of similarly situated

4    individuals, defined as follows:

5

> All persons in the United States who had bitcoins, other cryptocurrency, assets or money stored with FTX on November 10, 2022.

6

7    The following people are excluded from the Class: (1) any Judge or Magistrate presiding over

8    this action and members of their families; (2) Defendants, Defendants' successors, predecessors,

9    and any entity in which the Defendants have a controlling interest, and their current or former

10   officers and directors; (3) persons who properly execute and file a timely request for exclusion

11   from the Class; (4) persons whose claims in this matter have been finally adjudicated on the

12   merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal

13   representatives, successors, and assigns of any such excluded persons.

14   60.    **Numerosity**: The exact number of the members of the Class is unknown and not

15   available to Plaintiff at this time, but it is clear that individual joinder is impracticable. On

16   information and belief, and according to documents filed by FTX in support of its bankruptcy

17   petition, there are likely over one million members in the Class. Members of the Class can be

18   identified through Defendants' records and through third-party discovery.

19   61.    **Commonality and Predominance**: There are many questions of law and fact

20   common to Plaintiff's and the Class's claims, and those questions predominate over any

21   questions that may affect individual members of the Class. Common questions for the Class

22   include, but are not necessarily limited to the following:

23         a.    Whether the Defendants' conduct constitutes fraud;

24         b.    Whether the Defendants' conduct constitutes conversion;

25         c.    Whether the Defendants' conduct constitutes unjust enrichment.

26   62.    **Typicality**: Plaintiff's claims are typical of the claims of other members of the

27   Class in that Plaintiff and the members of the Class were harmed, and face ongoing harm, arising

28   out of Defendants' wrongful conduct.

63.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Class, as Plaintiff and each member of the Class lost money they would not have otherwise lost because of Defendants' unlawful conduct. Plaintiff also has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff. Plaintiff and their counsel are committed to vigorously prosecuting this action on behalf of the Class and have the financial resources to do so. Neither Plaintiff nor their counsel have any interest adverse to the Class.

64.     **Superiority**: This case is also appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The harm suffered by the individual members of the Class is likely to have been relatively small compared to the burden and expense of prosecuting individual actions to redress Defendants' wrongful conduct. Absent a class action, it would be difficult for the individual members of the Class to obtain effective relief from Defendants. Even if members of the Class themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

65.     Plaintiff reserves the right to revise each of the foregoing allegations based on facts learned through additional investigation and in discovery.

### FIRST CAUSE OF ACTION
#### Fraud
**Against Samuel Bankman-Fried, Caroline Ellison, Nishad Singh, Gary Wang, and Sam Trabucco**
**(On behalf of Plaintiff and the Class)**

66.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

67.     Through SBF's public statements, marketing materials, and advertisements, SBF, Singh, and Wang represented to Plaintiff and the Class that FTX would, *inter alia*, protect their crypto assets, and safely and quickly allow them to buy, sell, trade, or withdraw the same. SBF, Singh, and Wang deliberately withheld from Plaintiff and the Class that their deposits were being transferred to Alameda Research under Ellison and Trabucco's control. Defendants conspired to take Plaintiff and the Class's funds and give them to Ellison and Trabucco without their knowledge or consent.

68.     SBF, Singh, and Wang never intended to safeguard users' crypto assets.

69.     Instead, SBF, Singh, and Wang spread deliberate falsehoods, even as the music stopped for FTX. SBF claimed that users' assets were safe, even after he had gambled and otherwise frittered them away.

70.     SBF, Singh, and Wang's representations to Plaintiff and the members of the Class were knowingly and intentionally false.

71.     Knowing that consumers are less likely to do business with companies that fail to adequately safeguard and hold their crypto assets or allow them to buy, sell, trade, or withdraw the same, SBF and the Inner Circle made these false representations with the intention that Plaintiff and the members of the Class would rely on them in contracting with FTX and transferring money and cryptocurrency into their accounts.

72.     SBF made false representations to Plaintiff and the members of the Class online when he tweeted that consumer assets were "fine." This was even after FTX had suspended withdrawals.

73.     Knowing that users would stop depositing bitcoins and funds in their accounts, and would instead attempt to withdraw funds or close accounts if made aware of the colossal losses of assets FTX faced, SBF and the Inner Circle made the false representations and omissions with the intent that Plaintiff and the members of the Class would rely on them and continue to deposit money and cryptocurrencies into their FTX accounts and not attempt to withdraw funds and/or close accounts.

74. Had SBF and the Inner Circle disclosed FTX's true practices and intentions, Plaintiff and the members of the Class would have stopped depositing cash and/or cryptocurrencies into their FTX accounts, immediately taken any available steps to remove their assets from the exchange, or would not have maintained accounts with FTX at all.

75. Accordingly, SBF and the Inner Circle's fraudulent conduct caused Plaintiff and the Class to suffer actual harm in the amount of the difference between the cryptocurrency or fiat currency that was in their FTX accounts at the time it froze all withdrawals and the amount that will be actually returned to them under the liquidation proceedings in FTX's bankruptcy.

76. Defendants intentionally misrepresented facts and deceived Plaintiff and the Class about the safety of their deposits, and concealed material facts known to them with the intention of depriving Plaintiff and the Class of their property.

77. Plaintiff and the Class seek to recover the economic injury and other damages suffered as a result of Defendants' unlawful conduct in the form of the price of the cryptocurrency and fiat currency in their FTX accounts that cannot be recovered. Plaintiff and the Class also seek punitive damages for Defendant's unlawful conduct.

## SECOND CAUSE OF ACTION
### Unjust Enrichment
**Against Samuel Bankman-Fried, Caroline Ellison, Nishad Singh, Gary Wang, and Sam Trabucco**
**(On behalf of Plaintiff and the Class)**

78. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

79. Plaintiff and the Class conferred a monetary benefit on SBF, Singh, and Wang in the form of fees paid for FTX's transaction services. Plaintiff and the Class's deposits also helped prop up FTX and make it appear valuable despite the fact that it was severely in the red.

80. Plaintiff and the Class also conferred a monetary benefit on Ellison and Trabucco when Ellison and Trabucco accepted funds that they knew, or should have known, were FTX customer deposits. With Plaintiff and the Class's money, Ellison and Trabucco were able to continue to make risky investments long after Alameda would have otherwise collapsed. Ellison and Trabucco were able to continue receiving compensation for months longer than they would have if Alameda had been forced to declare bankruptcy when it first became insolvent.

81.     Defendants appreciate or have knowledge of the benefits conferred upon them by Plaintiff and the Class.

82.     Under principles of equity and good conscience, Defendants should not be permitted to retain the transactions fees and compensation they received as a result of their misappropriation of Plaintiff and the Class's assets, because they knowingly concealed material information from Plaintiff and the Class regarding their transaction deposits (i.e., that they would be unable to thereafter withdraw such money from their FTX accounts), which directly resulted in the loss of Plaintiff and the Class's monies stored on the exchange.

83.     Defendants had a duty to disclose such material information so Plaintiff and the Class could make an informed decision about whether to leave their assets with FTX.

84.     As a result of Defendants' conduct, Plaintiff and the Class suffered damages in the form of the transaction fees they paid for FTX's services and the assets they lost.

85.     Plaintiff and the Class Members have no other adequate remedy at law.

86.     Plaintiff, individually and on behalf of the Class, seek restitution of all monies Defendants have unjustly received as a result of their conduct alleged herein, as well as interest, reasonable attorneys' fees, expenses, and costs to the extent allowable, as well as all other relief the Court deems necessary to make them whole.

### THIRD CAUSE OF ACTION
#### Conversion
**Against Samuel Bankman-Fried, Caroline Ellison, Nishad Singh, Gary Wang, and Sam Trabucco**
**(On behalf of Plaintiff and the Class)**

87.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

88.     Without Plaintiff or the Class's consent, SBF and the Inner Circle intentionally deprived Plaintiff and the Class of their rightful possession of their crypto assets and fiat currencies stored on FTX.

89.     Defendants intentionally, and without authority, assumed and exercised control over Plaintiff and the Class's cryptocurrency and money, interfering with their right to possession of the same, by (a) causing Plaintiff and the Class's FTX accounts to be restrained,

and (b) by causing cryptocurrency and money to be withdrawn from Plaintiff and the Class's
FTX accounts and given to Alameda Research.

90.     At all relevant times, SBF and the Inner Circle acted with wanton, recklessness
and total and deliberate disregard for the personal rights of Plaintiff and the Class.

91.     SBF and the Inner Circle's improper restraint of Plaintiff and the Class's
cryptocurrency and money, which harmfully interfered with Plaintiff and the Class's rights to
control their own property, constitutes conversion.

92.     Plaintiff and the Class are entitled to to actual damages.

### PRAYER FOR RELIEF

Plaintiff Michael Elliott Jessup, individually and on behalf of all others similarly situated,
respectfully request that this Court enter an Order:

(a)     Certifying this case as a class action on behalf of the Class defined above,
appointing Plaintiff Michael Elliott Jessup as representative of the Class, and appointing his
counsel as Class Counsel;

(b)     An award of actual damages;

(c)     An award of restitution for Defendants' wrongful conduct;

(d)     An award of reasonable attorneys' fees and costs;

(e)     An award of punitive or exemplary damages; and

(g)     Such other and further relief that the Court deems reasonable and just.

### JURY DEMAND

Plaintiff requests a trial by jury of all claims that can be so tried.

Respectfully Submitted,

**MICHAEL ELLIOTT JESSUP**, individually and
on behalf of all others similarly situated,

Dated: December 5, 2022

By: /s/ Todd Logan
    One of Plaintiff's Attorneys

Rafey S. Balabanian (SBN 315962)
rbalabanian@edelson.com
Todd Logan (SBN 305912)
tlogan@edelson.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Yaman Salahi (SBN 288752)
ysalahi@edelson.com
P. Solange Hilfinger-Pardo (SBN 320055)
shilfingerpardo@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300
Fax: 415.373.9435

*Counsel for Plaintiff and the Proposed Class*